**Ben KALKA and Ken Mitchell, Plaintiffs,**

v.

**John MEGATHLIN, et al., Defendants.**

**No. CV 95–63–TUC–WDB.**

United States District Court,
D. Arizona.

May 18, 1998.

Donald B. Overall, Eugene R. Bracamonte, Tucson, AZ, Gail Killefer, U.S. Attorney's Office, San Francisco, CA, for Ivan O. White, Stephen Pontesso, Thomas F. Long, John Pendelton, Linda Snaders, Tom Byron, Mike Santelle, Frank J. Garcia, Patrick Sheehey, Kevin Giddens, Norm Uptagrafft.

## ORDER

BROWNING, District Judge.

Pending before the Court are Defendants' December 2, 1997 Motion for Summary Judgment, and Plaintiffs' December 3, 1997 Motion for Summary Judgment. The motions are fully briefed and ready for decision.[1] Based on the following, the Court will grant Defendants' motion and deny Plaintiffs' motion.

### I. Factual and Procedural Background

Plaintiff Ben Kalka was housed as an inmate at FCI Tucson from August 27, 1993 to May 9, 1995, with a few brief intervening transfers to other facilities. Between September 2, 1993 and June 2, 1995, Kalka received four hundred thirty-eight (438) pieces of legal mail at FCI Tucson. Pursuant to policy regulations, legal mail receives special handling at the prison, to provide confidentiality between an inmate and his attorney. Federal regulations provide that mail from attorneys is to be marked "Special Mail," and it shall be opened "only in the presence of the inmate for inspection for physical contraband and the qualification of any enclosures as special mail. The correspondence may not be read or copied." 28 C.F.R. § 540.18(a). Defendants agree that the confidentiality of the correspondence remains with the materials after being handed to the inmates. For all correspondence,

Christopher John Cannon, Sugarman & Cannon, San Francisco, CA, for Ben Kalka, Ken Mitchell.

Donald B. Overall, Eugene R. Bracamonte, Monte C. Clausen, U.S. Atty., Tucson, AZ, Gail Killefer, U.S. Attorney's Office, San Francisco, CA, for John Megathlin.

"[t]he Warden shall return rejected correspondence to the sender unless the correspondence includes plans for or discussion of commission of a crime or evidence of a crime, in which case there is no need to return the correspondence or give notice of the rejection, and the correspondence

---

1. Oral argument was not requested pursuant to Rule 1.10(f) of the Rules of Practice of the United States District Court for the District of Arizona. In its discretion, the Court concludes that the parties' briefs are a sufficient basis on which to decide these motions.

should be referred to appropriate law enforcement authorities."

28 C.F.R. § 540.13.

On July 15, 1994, Defendant Kevin Giddens, a correctional officer, conducted a cell search of Kalka's cell and filing cabinet. Giddens leafed through all of Kalka's papers, including his legal materials, looking for contraband.

Prior to August 12, 1994, Defendant Patrick Sheehey, a correctional counselor at FCI Tucson, opened a piece of Kalka's legal mail from Plaintiff Ken Mitchell in Kalka's presence to inspect for contraband. Sheehey saw that the only enclosure was a statement from Merrill Lynch ("Document # 1"). Kalka protested that Sheehey was reviewing his mail, and subsequently filed a grievance on the issue. With Kalka present, Sheehey contacted Defendant Tom Byron, the institution's paralegal, to verify that this type of document was appropriately put through as legal mail. Byron told Sheehey it was appropriate and he believed that there was no reason to breach the attorney-client privilege with regard to that document. Sheehey passed the envelope on to Kalka.

Around August 12, 1994, Sheehey took Kalka to the visiting room to place a client-attorney call. Kalka's call was placed for him in the glassed-in attorney-client room. While Kalka was on the phone, an inmate brought Sheehey a piece of paper found on a chair near where Kalka had previously been seated. Sheehey looked at the paper to determine the owner, but it contained no identification. The document contained instructions for the transfer of large sums of money at a Zurich bank ("Document # 2"). Sheehey noticed Kalka looking at him, so he indicated the document to see if it was Kalka's. Kalka nodded and Sheehey provided him the document. The paper had been sent to Kalka by Plaintiff Mitchell as legal mail.

Sometime after this incident, Sheehey received a call from the central office about an unrelated appeal filed by Kalka. The appeal related to Kalka's claimed indigent status, which led Sheehey to mention Document # 2 that he had seen in the visiting room. The caller advised Sheehey to contact Byron about it, which Sheehey did that day. After hearing Sheehey's description of Document

# 2, Byron suspected that Kalka may have been laundering money. Byron then called John Jordan, a U.S. Attorney, and relayed Sheehey's description of Document # 2. Later, Byron was contacted by IRS Special Agent Douglas Bricker, the leader of a money laundering investigation involving Kalka. Bricker asked whether he had a copy of Document # 2, and Byron told Bricker that he did not have Document # 2 and that it could not be obtained without a search warrant. When contacted by Bricker, Sheehey also told him that Document # 2 was probably privileged and he could not obtain it for Bricker. Sheehey further told Bricker about the existence of the Merrill Lynch Document # 1 which he had seen in Kalka's legal mail. On August 18, 1994, Bricker obtained a search warrant for Kalka's cell and file cabinet to obtain evidence of money laundering activities. The search warrant affidavit relied, in part, on the information provided by Sheehey regarding the two documents he had seen. Bricker executed the search warrant on August 19, 1994, at FCI Tucson.

On December 8, 1994, Plaintiffs Ben Kalka and Ken Mitchell filed this *Bivens* action in the District Court of the Northern District of California and it was transferred to this Court on January 30, 1995. Plaintiffs name the following Defendants in their personal and official capacities: John Megathlin, Administrator, National Inmate Appeals; Ivan O. White, Jr., Regional Director; Warden Stephen Pontesso; Associate Warden Thomas Long; Associate Warden John Pendelton; Executive Assistant Linda Sanders; Paralegal Tom Byron; Case Manager Mike Santelle; Unit Manager Frank Garcia; Correctional Officer Patrick Sheehey; Correctional Officer Kevin Giddens; and Correctional Officer Norm Uptagrafft. Plaintiffs request injunctive and monetary relief on their claims that their rights were violated under the First, Fifth, Sixth and Fourteenth Amendments by Defendants' interference with Kalka's incoming legal mail. Plaintiff Kalka also alleges that Defendants retaliated against him because of his frequent administrative and judicial actions. On May 9, 1995, the Court granted a preliminary injunction preventing Defendants from opening Kalka's legal mail in any way other than provided for

in 28 C.F.R. § 540.18. In the same Order, the Court denied Plaintiffs' request for a preliminary injunction preventing Defendants from transferring Kalka to another facility. On December 2, 1997 and December 3, 1997, Plaintiffs and Defendants, respectively, filed motions for summary judgment in which the parties agree to dismiss the retaliation claims without prejudice.

## II. Standard

Summary judgment is proper where no genuine issue as to any material fact exists and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The initial burden rests on the moving party to point out the absence of any genuine issue of material fact, but the moving party need not support its motion with affidavits or other supporting materials. Fed.R.Civ.P. 56(a); *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once satisfied, the burden shifts to the opponent to demonstrate through production of probative (and admissible) evidence that an issue of fact remains to be tried. *Id.* at 323–24, 106 S.Ct. 2548. The non-moving party may not rest on mere denials of the movant's pleadings, but must respond asserting specific facts showing a genuine issue exists precluding a grant of summary judgment. Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The Court must accept the non-movant's evidence as true and view all inferences in the light most favorable to the non-movant. *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir.1987).

## III. Discussion

Given that both parties filed motions for summary judgment, they are in agreement that there is no genuine issue of fact, and that the case can be decided on these motions as a matter of law. Although the parties characterize the facts differently, the Court agrees that there is no issue of material fact, and therefore the claims may be decided as a matter of law.

## CONSTITUTIONAL RIGHTS AT ISSUE

Plaintiffs' Complaint alleges violations of their rights under the First, Fifth, Sixth and Fourteenth Amendments to the Constitution. In contrast, Plaintiffs' Motion for Summary Judgment requests judgment based on the Fourth, Fifth and Sixth Amendments. As the Defendants do not challenge the assertion of a Fourth Amendment claim, and because it has the same basis in fact as the other claims, the Court will leave it in. Plaintiffs do not address the First Amendment or the Fourteenth Amendment in their Motion for Summary Judgment. The Defendants, however, include the First Amendment in their Motion for Summary Judgment and the Court will address it. The Fourteenth Amendment states that, "No state shall ..." deny due process or equal protection. U.S. CONST. amend. XIV, § 1. The language of the amendment makes clear that it applies to state action and not federal action as is at issue in this case. The Court assumes Plaintiffs recognized this error and consciously did not include it in their motion. Consequently, the Court will not address the Fourteenth Amendment as it is not applicable to the case. The result of the above discussion and the parties stipulated dismissal of claims is that only Plaintiffs' claims alleged under the First, Fourth, Fifth and Sixth Amendments relating to Kalka's legal mail remain.

## RESPONDEAT SUPERIOR

Before reaching the merits of Plaintiffs' claims, it is expeditious for the Court to determine whether it is necessary to reach the merits with regard to each named Defendant. In Defendants' motion for summary judgment, they correctly state that there is no respondeat superior liability in a *Bivens* action. *See Terrell v. Brewer*, 935 F.2d 1015, 1018 (9th Cir.1991). The following Defendants argue that they should be dismissed because the allegations against them derive solely from their supervisory capacities and therefore they are not liable under *Bivens:* Megathlin, White, Pontesso, Long, Pendleton, Sanders, Garcia, Byron and Uptagrafft. Plaintiffs respond that Defendants Pontesso, Byron, Sheehey and Giddens are liable based on direct actions taken by them. The Court takes this as a tacit admission that the other Defendants listed in Defendants' motion—Megathlin, White, Long, Pendleton, Sanders, Garcia, and Uptagrafft—cannot be held liable on Plaintiffs' claims. In looking to the Complaint itself, the Court agrees that the Defendants listed

in the preceding sentence are cited only for their supervisory roles, and will therefore grant summary judgment for those Defendants on all claims alleged against them.

Defendant Santelle is noted in Defendants' motion as deceased. Because Plaintiffs case is brought against Defendants in their personal and official capacities, at a minimum, the claims against Santelle in his official capacity survive and his successor would be automatically substituted in under Federal Rule of Civil Procedure 25(d). As with the Defendants discussed above, the allegations against Santelle are brought solely based on his supervisory capacity, which Plaintiffs implicitly acknowledge by not citing him as directly liable in their Response to Defendants' Motion for Summary Judgment. Santelle personally and his official successor are not liable for any *Bivens* claims alleged against them based on respondeat superior and, therefore, the Court will grant summary judgment for Defendant Santelle and his official successor.

In Defendants' Response to Plaintiffs' Motion for Summary Judgment, Defendants again try to limit the number of parties and state that the only Defendants remaining in the case appear to be Sheehey, Giddens and Byron. The Court takes this as Defendants' acknowledgment that allegations against Byron exist beyond those eliminated by respondeat superior. This leaves only Defendant Pontesso in contention between the parties. Plaintiffs state in their Response to Defendants' Motion for Summary Judgment that Pontesso approved of the search and denied Kalka's complaints about the incidents. In looking to the deposition of Pontesso cited by Plaintiffs, Pontesso never authorized or directed any search, he merely stated in a deposition that he believed Sheehey had followed the rules and behaved appropriately. The only actions that Plaintiffs attribute directly to Pontesso in their facts is his denial of Kalka's administrative complaints. However, Plaintiffs do not allege that this action violated their constitutional rights, rather it is stated as a ratification of actions taken by others. Plaintiffs fail to allege that Pontesso personally violated their constitutional rights. Thus, the Court will grant summary judgment with regard to claims alleged against Defendant Pontesso. This leaves only Shee-

hey, Giddens and Byron as Defendants in this action.

## CLAIMS AGAINST DEFENDANT GIDDENS

█ Plaintiffs' Complaint states that, "[o]n or about July 15, 1994, outside of Kalka's presence, Kalka's legal materials were searched by Correctional Officer Giddens." Complaint at p. 5, Il. 8–10. That is the sole reference to the conduct of Defendant Giddens in the Complaint. In Plaintiffs' Motion for Summary Judgment, Giddens is merely referenced as a Defendant, and even the minimal facts quoted above are not reiterated. There is no dispute that the cell search took place, but Defendants contend that this did not violate Kalka's constitutional rights, and nowhere do Plaintiffs challenge that argument. Further, Plaintiffs do not allege that this action caused any injury. Prisoners have no expectation of privacy in their cells, *see Hudson v. Palmer,* 468 U.S. 517, 525–28, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), nor do they have the right to be present when their cells are searched. *See Bell v. Wolfish,* 441 U.S. 520, 557, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). The search may include looking through personal property including legal materials. *See Mitchell v. Dupnik,* 75 F.3d 517, 523 (9th Cir.1996)(finding search of legal papers without inmate present constitutional even when it violates a prison regulation). Based on the foregoing, Defendant Giddens' actions did not violate Plaintiffs' constitutional rights, and summary judgment will be granted for Defendant Giddens on all claims alleged against him.

## CLAIMS RELATING TO DOCUMENT # 2

█ The basis of Plaintiffs' claims are that legal mail is protected by the attorney-client privilege, and as such Defendants did not have a right to look at legal mail or to relate information about the material to third party law enforcement. Document # 2 was found unattended in the visiting room and contained no owner identification or indication that Plaintiffs considered it a privileged document. Therefore, Defendant Sheehey did not violate any rights or privilege in looking at the document, and relating the information contained in the document to others. Defen-

dants will be granted summary judgment on all claims involving Document # 2. Therefore, the analysis below applies only to Document # 1.

## QUALIFIED IMMUNITY
### Standard

"Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The crucial determination is the " 'objective legal reasonableness' of the action assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)(quoting *Harlow,* 457 U.S. at 819, 818, 102 S.Ct. 2727). To give relevance to the "clearly established" standard, the right must be defined at a level of specificity such that the official in question would know that his actions violated that right. *See Anderson,* 483 U.S. at 639–40, 107 S.Ct. 3034. The unlawfulness must be clear, although the specific action does not have to previously have been found unlawful. *See id.* at 640, 107 S.Ct. 3034 (citing *Mitchell v. Forsyth,* 472 U.S. 511, 535 n. 12, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *Malley v. Briggs,* 475 U.S. 335, 344–45, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)). Qualified immunity is a broad defense which the Supreme Court describes as protecting "all but the plainly incompetent or those who knowingly violate the law." *Malley,* 475 U.S. at 341, 106 S.Ct. 1092.

The relevant inquiry is "1) Was the law governing the official's conduct clearly established? 2) Under the law, could a reasonable officer have believed the conduct was lawful?" *Act Up!/Portland v.. Bagley,* 988 F.2d 868, 871 (9th Cir.1993). To determine if the right asserted by the Plaintiff was clearly defined, the court "must 'survey the legal landscape' " as it existed at the time of the

conduct in question. *Wood v. Ostrander,* 879 F.2d 583, 591 (9th Cir.1989) (quoting *Ward v. County of San Diego,* 791 F.2d 1329, 1332 (9th Cir.1986)). Absent controlling precedent on point, courts look to all available decisional law. *See Wood,* 879 F.2d at 591 (citing *Capoeman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985)).

### Right Defined

On a general level Plaintiffs allege violations of their First, Fourth, Fifth and Sixth Amendment rights to privacy, access to the Courts, effective assistance of counsel, equal protection, due process, and freedom of association. In their motions for summary judgment, Plaintiffs and Defendants frame the specific conduct in question differently from one another.[2] From the facts presented, the Court discerned two specific rights at issue: (1) Whether an inmate and his attorney's rights under the First, Fourth, Fifth and Sixth Amendments are violated when a correctional officer looks at a piece of legal mail, opened in the presence of an inmate, long enough to determine what type of document is enclosed; and (2) Whether an inmate and his attorney's rights under the First, Fourth, Fifth and Sixth Amendments are violated when prison officials notify law enforcement of the existence of a type of document received in legal mail, when the officials become aware that the information may be evidence of a crime? Although Plaintiffs dwell on the validity of the search warrant executed by Bricker on August 19, 1994, the named Defendants' actions ended when they passed their knowledge on to law enforcement, and they have no liability beyond that point. The fact that a search warrant was obtained due to Defendants' actions addresses only the question of whether Plaintiffs were injured by Defendants' conduct.

### Was the Right Clearly Established?

At the time of the conduct in July and August of 1994, and to this date, the seminal case on the general issue of legal mail in

---

**2.** Defendants state the issue as "whether information obtained by BOP staff through inspection for contraband of properly addressed attorney-client correspondence or 'Special Mail,' may then be referred to a third party." Defs.' Mot.

Summ. J. at p. 3, Il. 19–22. Plaintiffs define the issue as "may prison officials use information learned from their reading of prisoner legal mail to the detriment of the prisoner and his lawyer." Pls.' Resp. Defs.' Mot. Summ. J. at p. 1, Il. 19–21.

prisons is *Wolff v. McDonnell*, which held that "petitioners, by acceding to a rule whereby an inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires." *Wolff v. McDonnell*, 418 U.S. 539, 577, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Respondent claimed that the opening of his legal mail, even in his presence, violated his rights under the First, Sixth and Fourteenth Amendments. The Supreme Court began its analysis by stating that "the constitutional status of the rights asserted, as applied in this situation, is far from clear." *Id.* at 575, 94 S.Ct. 2963. The Court further stated that "freedom from censorship is not equivalent to freedom from inspection or perusal." *Id.* at 576, 94 S.Ct. 2963. The Supreme Court acknowledged the possibility that contraband could be contained in correspondence from an attorney and stated that an inspection in front of the inmate would not "chill communications" because the mail would not be read. *Id.* at 577, 94 S.Ct. 2963. The Supreme Court has not re-examined the issue since *Wolff,* and as of July 1994, other courts had enunciated few clear principles on the subject.

The Fifth Circuit noted two years after *Wolff* that the Supreme Court opinion "left open significant questions concerning the constitutional underpinning of constraints on the opening and reading of inmate mail by prison officials." *Taylor v. Sterrett,* 532 F.2d 462, 467 (5th Cir.1976). This Court is not aware of any decisional or statutory law addressing the specific rights in question in this case. The law addressing the general or related issues is unclear on whether the Defendants' actions would violate Plaintiffs' constitutional rights. One of the only principles clearly established by federal regulations, prison regulations, and case law is that a prison policy to read incoming legal mail violates an inmate's constitutional rights. *See* 28 C.F.R. § 540.18(a); Federal Bureau of Prisons Program Statement 5265.08, pg. 11, para. 13(a); *see, e.g., Thongvanh v. Thalacker,* 17 F.3d 256, 258–59 (8th Cir.1994); *Lemon v. Dugger,* 931 F.2d 1465, 1467 (11th Cir.1991); *Taylor,* 532 F.2d at 477–78. Federal regulations require, and several courts have held, that the regular opening of legal mail must be done in the inmate's presence.

*See* 28 C.F.R. § 540.18; *see, e.g., Jensen v. Klecker,* 648 F.2d 1179, 1182–83 (8th Cir. 1981); *Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986). In contrast, several circuits including the Ninth have held that an isolated or occasional opening of legal mail outside the presence of the inmate is not necessarily a constitutional violation. *See, e.g. Brewer v. Wilkinson,* 3 F.3d 816, 825 (5th Cir.1993); *Stevenson v. Koskey,* 877 F.2d 1435, 1441 (9th Cir.1989). Federal prison regulations allow inspection of legal mail in the presence of the inmate for contraband and "the qualification of any enclosures in special mail." 28 C.F.R. § 540.18. The regulations also allow a warden to reject without notice any type of mail which contains evidence of a crime and to refer it to law enforcement. *See* 28 C.F.R. § 540.13.

### Right (1) Looking at Legal Mail

█ Regulations allow prison officials to inspect enclosures to determine if they qualify as special mail, although they are not allowed to "read" the mail. Defendant Sheehey's actions fall directly into this murky area, as no law defines what the inspection may entail to determine if an enclosure qualifies as special mail. The evidence shows that Sheehey inspected enough to determine what type of document it was—a Merrill Lynch statement—but that he looked no further. Additionally, an occasional opening of legal mail outside the inmate's presence does not rise to a violation, though a policy of doing so is a violation. The piece of legal mail in question was one of four hundred thirty-eight (438) received by Plaintiff while at FCI Tucson, and it is the only one over which he alleges his rights were violated. In light of other courts' distinctions between a policy of opening legal mail outside an inmate's presence and an occasional occurrence of such action, does one questionable inspection of legal mail, opened in the inmate's presence, rise to a constitutional violation? Without clear evidence that a document was actually read, no law is on point. Nor does the law available make clear that Defendant would have known he was violating Plaintiffs' rights. Therefore, the Court finds that Defendants are entitled to qualified immunity on this issue.

*Right (2) Referring Legal Mail Information to Law Enforcement*

On the second question, regarding the disclosure to law enforcement of information learned from a search of legal mail, there is even less guidance available. The only relevant regulation goes to the rejection of any mail which contains evidence of a crime. *See* 28 C.F.R. § 540.13. At the point at which Defendants disclosed the information about the Merrill Lynch document, they believed it may have been evidence of money laundering by Kalka. This was after their initial decision that the document was privileged and appropriately classified as Special Mail. It seems illogical that one could report evidence of a crime contained in mail at the time of the inspection and not at a later time when its potential classification as evidence of a crime becomes known. Neither party cites any case law which speaks to this issue. Defendants argue that *Wolff* is null if, upon inspection of legal mail, prison officials may not take action upon discovering evidence of a crime. The Court will not explicitly extend *Wolff* based on the circumstances of this case. However, the Court finds that, at a minimum, the law on this issue is not clearly established and Defendants are entitled to qualified immunity.

*Conclusion*

The Court finds that neither right alleged by Plaintiffs was clearly established at the time of Defendants' conduct. Because the Court reaches this conclusion, Defendants Sheehey and Byron are entitled to qualified immunity and the Court does not have to reach the second question of whether they could reasonably have believed their conduct was lawful.

*INJUNCTIVE RELIEF*

Qualified immunity only protects officials from liability for money damages, it does not preclude injunctive relief. *See Am. Fire, Theft and Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991). Plaintiffs' Motion for Summary Judgment states that they seek money damages and injunctive relief. Plaintiffs' Complaint requests three types of injunctive relief: 1) disallow the opening of Kalka's legal mail; 2) preclude Defendants from transferring Kalka until this litigation is resolved; and 3) enjoin Defendants from retaliating against Kalka in the future. In the Court's May 9, 1995 Order, regarding Plaintiffs' motion for a preliminary injunction, the Court ruled on the first two requests: (1) prohibiting Defendants from opening Kalka's legal mail in any way other than that provided for in 28 C.F.R. § 540.18; and (2) denying a preliminary injunction to prevent Defendants from transferring Kalka to another facility. The third request relates to Kalka's retaliation claims which the parties stipulated to dismiss. Therefore, all of the above requests for injunctive relief are now moot. In addition, Kalka has been transferred out of FCI Tucson and is no longer in Defendants' custody, which precludes meaningful injunctive relief. Thus, injunctive relief is not available and summary judgment will be entered for Defendants on Plaintiffs' claims for injunctive relief.

## IV. Conclusion

Pursuant to the parties stipulation, the Court will dismiss without prejudice Kalka's claims regarding retaliation. The Court will grant summary judgment to the following Defendants because they are named solely for their supervisory roles and there is no respondeat superior in a *Bivens* action: Megathlin, White, Long, Pendleton, Sanders, Garcia, Uptagrafft, and Santelle. The Court will grant summary judgment to Defendant Pontesso because Plaintiffs fail to allege that his actions violated their constitutional rights. The Court will grant summary judgment to Defendant Giddens because his actions in searching Kalka's cell and legal materials do not rise to a violation of his constitutional rights. The Court finds that the rights alleged by Plaintiffs were not clearly established at the time that Sheehey and Byron acted and therefore they are entitled to qualified immunity from money damages. Further, Plaintiffs' request for injunctive relief is now moot. Thus, the Court will grant summary judgment to Defendants Sheehey and Byron. In summary, the Court will grant summary judgment for all Defendants on all claims alleged by Plaintiffs under the First, Fourth, Fifth and Sixth Amendments relating to Kalka's legal mail.

Accordingly, **IT IS ORDERED** that:

(1) Plaintiffs' claims for retaliation are **DISMISSED WITHOUT PREJUDICE;**

(2) Defendants' December 2, 1997 Motion for Summary Judgment is **GRANTED;**

(3) Plaintiffs' December 3, 1997 Motion for Summary Judgment is **DENIED;** and

(4) this action is **DISMISSED.**