Brent BARSTOW, Plaintiff,

v.

**KENNEBEC COUNTY JAIL**
**et al., Defendants.**

No. CIV. 99–0261–B.

United States District Court,
D. Maine.

Aug. 22, 2000.

Brent Barstow, Albion, ME, pro se.

Michael J. Schmidt, Wheeler & Arey, P.A., Waterville, ME, for Defendants.

### MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

This action involves the search of Plaintiff Brent Barstow's ("Barstow") prison cell and temporary seizure of some of his papers. Acting *pro se*, Barstow filed a six-count complaint against Bryan Lamoreau, Sheriff of Kennebec County, Gilbert Turcotte ("Turcotte"), a Detective with Kenne-

bec County Sheriff's Office, and Nancy Reins, Wes Kieltyka, and Zackery Matthews, each individually and in their capacity as present or former County Commissioners of Kennebec County, and the County itself.[1] He claims that his rights were violated under *42 U.S.C. § 1983* (Count II) and the Maine Civil Rights Act, *5 M.R.S.A. § 4682* (Count I). He also brings claims for conversion (Count III), emotional distress (Count IV), relief under Maine statutory provisions relating to criminal mischief and theft (Count V), and punitive damages (Count VI). Defendants file a motion for summary judgment and/or judgment on the pleadings on all claims (Docket No. 10). For the following reasons, the Court **GRANTS** the motion with regard to Counts I and II, and, since no federal question remains in the case and the parties are not diverse, declines to exercise jurisdiction over the remaining state law claims (Counts III, IV, V, and VI). *See 28 U.S.C. § 1367(c); see also Penobscot Indian Nation v. Key Bank of Maine,* 112 F.3d 538, 564 (1st Cir.1997) ("We emphasize that the decision to retain or disclaim jurisdiction over the remaining state law claims at issue in this case lies in the broad discretion of the district court."); *Carey on Behalf of Carey v. Maine School Administrative Dist. No. 17,* 754 F.Supp. 906, 926–27 (D.Me.1990) ("In the present case, all of Plaintiffs' federal claims will be disposed of prior to trial. Thus, ... this Court is without jurisdiction over Plaintiffs' state law claims and must dismiss the claims without prejudice.").

## STANDARD

Because the Court has considered the Statement of Material Facts and affidavits filed by Defendants,[2] the Court treats Defendants' Motion as one for summary judgment. *See Fed.R.Civ.P. 12(c)* ("If, on a

motion for judgment on the pleadings, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment.").

Summary judgment is appropriate when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. *See Fed.R.Civ.P. 56(c).* Once the moving party has come forward identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any" which "it believes demonstrate the absence of a genuine issue of material fact," the adverse party may avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith,* 904 F.2d 112, 115 (1st Cir.1990). The court will not, however, pay heed to "conclusory allegations, improbable inferences [or] unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990). The role of the trial judge at the summary judgment stage "is not ... to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## BACKGROUND [3]

On October 22, 1997, Susan Mounce contacted Detective Turcotte to inform him

---

**1.** Although Barstow names the County as a Defendant in the caption of his complaint, he does not list the County as a party to the action. The Court concludes that no claim is articulated against the County by his complaint.

**2.** Barstow failed to submit a Statement of Material Facts in accordance with Local Rule 56.

**3.** Not only did Barstow fail to submit his own Statement of Material Facts, he also failed to properly controvert Defendants' Statement of

that she and her family had received a warning that Barstow was planning possible retaliatory reprisals against them. Defendants' Statement of Material Facts ("DSMF") (Docket No. 11) ¶ 1; Ex. 1, Aff. and Request for Search Warrant of Gilbert Turcotte, dated Oct. 30, 1997 ("Turcotte Aff. # 1") ¶ 1; Ex. 2, Aff. of Gilbert Turcotte dated Feb. 28, 2000 ("Turcotte Aff. # 2") ¶ 2. On the following day, Detective Turcotte met with the Mounce family. DSMF ¶ 2; Turcotte Aff. # 2 ¶ 3. They informed him that Scott Giles ("Giles"), Susan Mounce's son, received a telephone call from Ervin Mace ("Mace"), who told Giles that Barstow had declared that he was going to make trouble for the Mounce family upon his release from Kennebec County Jail. Id. Turcotte knew that Barstow was married to the Mounces' daughter, Jill Mounce Barstow, and that Jill had applied for and received a Protection from Abuse Order against Brent Barstow. DSMF ¶ 3; Turcotte Aff. # 1 ¶ 6. Based on this information, Turcotte interviewed Ervin Mace and discovered that Mace had been a cellmate of Barstow for 22 days, and that Mace had heard Barstow talk about what he was going to do to the Mounce family. DSMF ¶ 4; Turcotte Aff. # 2 ¶ 5. Mace also informed Turcotte that Barstow kept notes on the Mounce family in his cell. Id. After talking with Mace, Turcotte formed the impression that Barstow was planning or conceiving some type of retaliatory action against the Mounce family. Id.

Turcotte then met with Deputy District Attorney Alan P. Kelly, who advised Turcotte that it would be appropriate to get a search warrant prior to conducting a search of Barstow's cell. DSMF ¶ 5; Turcotte Aff. # 2 ¶ 6. Based on the above evidence, Turcotte believed he had probable cause to conduct such a search. DSMF ¶ 6; Turcotte Aff. # 2 ¶ 7. Turcotte then prepared an affidavit and request for a search warrant, which a justice of the peace signed on October 30, 1997.[4] DSMF ¶ 7; Turcotte Aff. # 2 ¶¶ 7–8. On that same day, Turcotte searched Barstow's cell at the Kennebec County Jail between 2:30 p.m. and 2:40 p.m. DSMF ¶¶ 8–9; Turcotte Aff. # 2 ¶ 8; Ex. 4, Items Seized Report. He removed from Barstow's cell two documents that contained the names of and/or information about the Mounce family, took them back to his office to review them, and determined that they did not contain any statements that constituted the crime of terrorizing. DSMF ¶¶ 10–11; Turcotte Aff. # 2 ¶¶ 9–11. After reviewing the documents, Turcotte returned the items to Sam Tlumak, a corrections officer presumably at the Kennebec County Jail, for return to Barstow. DSMF ¶ 12; Turcotte Aff. # 2 ¶ 12; Ex. 4, Items Seized Report.

## DISCUSSION

In support of his section 1983 claim, Barstow asserts that Turcotte's search and seizure of the documents from his cell violated his rights pursuant to the Fourth, Sixth, and Fourteenth Amendments of the

Material Facts in accordance with Local Rule 56. Therefore, Defendants facts are deemed to be admitted, since they are supported by citations to the record. See Local Rule 56(e).

Unfortunately for Barstow, his *pro se* status does not change this outcome. *See Rivera v. Riley*, 209 F.3d 24, 27–28, n. 2 (1st Cir.2000) (holding that a district court is "well within its authority to enter judgment based on the *pro se* appellants' blatant disregard" of a Local Rule of the District Court for the District of Puerto Rico requiring that a party opposing a motion for summary judgment to include in her opposition "a separate, short, and concise statement of the material facts as to which it is contended that there exists a genuine issue

to be tried, properly supported by specific reference to the record") (citing D.P.P.R. 311.12); *see also Eagle Eye Fishing Corp. v. U.S. Dept. of Commerce*, 20 F.3d 503, 506 (1st Cir.1994) (explaining that "the right of self-representation is not a license not to comply with relevant rules") (citation and internal quotation marks omitted).

4. Having failed to follow Local Rule 56, Barstow's assertion in his motion opposing summary judgment that Turcotte never secured a search warrant is not supported by the summary judgment record. In any event, Defendants attached a copy of the search warrant to their Statement of Material Facts.

United States Constitution. On behalf of his claim under the Maine Civil Rights Act, Barstow argues that the same search and seizure violated sections 5 (governing search and seizure) and 6A (due process) of Article I of the Maine Constitution.[5] In support of these claims, Barstow contends that there was no probable cause to search his cell for evidence that he had committed the crime of terrorizing. (See P.'s Objection to Def.'s Mot. for Summ. J. at 3).

■ The crime of terrorizing is defined by statute as follows:

A person is guilty of terrorizing if that person communicates to any person a threat to commit or to cause to be committed a crime of violence dangerous to human life, against the person to whom the communication is made or another, and the natural and probable consequence of such a threat, whether or not such consequence in fact occurs, is:

A. To place the person to whom the threat is communicated or the person threatened in reasonable fear that the crime will be committed.

See 17–A M.R.S.A. § 210. In finding probable cause, the justice of the peace did not need to find that Barstow actually committed the crime of terrorizing. See Illinois v. Gates, 462 U.S. 213, 244 n. 13, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.").[6]

■ The Court concludes that the totality of the circumstances support the justice of the peace's finding of probable cause. This conclusion is not based merely on Mace's statements to the Mounce family and Detective Turcotte about Barstow's possible retaliatory plans, but also upon Turcotte's verification that Barstow and Mace were cell mates for twenty-two days and Turcotte's knowledge that the Jill Barstow had previously secured a Protection from Abuse Order against Plaintiff. Since the warrant was valid, the Court finds no support for Barstow's allegation that his Fourth Amendment rights were violated.[7] Therefore, to the extent that

5. For the purpose of the Court's inquiry in this case, the analysis of whether Barstow's rights were violated under the Maine Civil Rights Act (Count I) and 42 U.S.C. § 1983 (Count II) is identical. First, the Maine Supreme Judicial Court has consistently held that the due process concepts in the Maine Constitution are identical to those in the United States Constitution. See State v. Cote, 736 A.2d 262, 265 n. 6 (Me.1999) ("Due process concepts embodied in the Maine Constitution provide no greater protection to individuals than do those concepts contained within the United States Constitution.") (citation omitted); State v. Rosado, 669 A.2d 180, 182 (Me. 1996) (noting that the Maine Supreme Judicial Court "has long adhered to the principle that the Maine Constitution and the Constitution of the United States are declarative of identical concepts of due process") (citation omitted).

Second, the Maine Supreme Judicial Court has "refused to adopt a different or more stringent standard for searches under the Maine Constitution than is provided under the Fourth Amendment to the United States Constitution." State v. Ullring, 741 A.2d 1065, 1072 (1999) (citations omitted). Since the analysis of these two claims is identical, the Court will exercise jurisdiction over the Maine Civil Rights Act claim pursuant to 28 U.S.C. § 1367(a), and the Court's conclusions

as to the section 1983 claim are determinative of Barstow's claim under the Maine Civil Rights Act.

6. It is important to keep in mind that, in evaluating the justice of the peace's probable cause determination, this Court does not make a de novo review; rather, the justice of the peace's "determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236, 103 S.Ct. 2317 (citation and internal quotation marks omitted).

7. Even if the summary judgment record did support Barstow's contention that Turcotte did not have a warrant, the Fourth Amendment does not require government officers to secure a warrant prior to searching a prison cell. The Supreme Court in Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." Id. at 526, 104 S.Ct. 3194. Although this decision was based in large part on "the paramount interest in institutional security," id. at 528, 104 S.Ct. 3194, it has been construed to apply to

Barstow's section 1983 claim is based upon a finding that his Fourth Amendment rights were violated, it fails.[8]

situations that do not involve prison security. *See United States v. Reece,* 797 F.Supp. 843, 846 (D.Colo.1992) (noting that the *Hudson* Court's "unwillingness to recognize even limited exceptions of privacy in a prisoner's cell indicates that, regardless of a search's purpose, it is proper under the Fourth Amendment"), *aff'd,* No. 93–1059, 1994 WL 209809 (10th Cir. May 26, 1994).

Therefore, regardless of whether or not Turcotte had a warrant to search Barstow's prison cell, Barstow cannot base a 1983 claim upon a violation of his Fourth Amendment rights.

8. Barstow also argues that Turcotte seized a letter Barstow had drafted for his attorney, and such a seizure violated his rights under the Sixth Amendment. The summary judgment record, developed in accordance with Local Rule 56, does not contain any evidence demonstrating, as a proposition of fact, that such a letter was seized, and, therefore, the Court has no grounds upon which to conclude that a Sixth Amendment violation occurred.

Even assuming, as Barstow alleges, that the seized documents contained a privileged letter he had drafted for his attorney, the outcome of this case would not be changed. Barstow argues that Turcotte's seizure of a letter he had drafted for his attorney violated his Sixth Amendment rights. The Sixth Amendment "protect[s] the attorney-client relationship from intrusion in the criminal setting." *Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Typically, prison officials may open mail from attorneys to a prisoner only in the presence of that prisoner, *see Smith v. Robbins,* 454 F.2d 696, 697 (1st Cir.1972), and even then the prison official, when searching for contraband in such letters, must not read the letter. *See Henry v. Perrin,* 609 F.2d 1010, 1014 (1st Cir.1979) (although confining its ruling to the facts of that case: "[p]age by page scrutiny for textual contraband by a prison guard of an attorney's file relating to the defense of his inmate client against a charge of attempted escape"); *United States v. O'Rourke,* 2000 WL 761659 (D.Me.). In Barstow's case, unlike most others, the contraband that Turcotte was searching for was the letter itself, not, for example, an easily hidden drug in an envelope containing a letter. Therefore, Turcotte had to read the draft letter.

Courts are unclear about whether legal mail or materials maintained in a prisoner's cell loses its Sixth Amendment protection under the rationale of *Hudson.* Some have found a Sixth Amendment violation. *See Marquez v. Miranda,* No. C 92–3934 FMS, 1998 WL 57000, at *2, 3 (N.D.Cal. Jan.28, 1998) (noting that it could find no cases discussing *Hudson's* impact, if any, on legal mail in a prisoner's cell, but finding that allowing prison employees to read such mail violated the Sixth Amendment because such intrusions could have a "chilling" effect, since prisoners might be less willing to share information with their attorneys; the court nonetheless found that defendants were insulated from liability through qualified immunity.).

Other courts have concluded that searches that look through legal materials do not violate the Sixth Amendment under *Hudson.* *See Kalka v. Megathlin,* 10 F.Supp.2d 1117, 1121 (D.Ariz.1998) (citing *Hudson* and holding that prison officials, when searching prison cells, can look through legal materials).

Still other courts, while not addressing *Hudson,* conclude that "an isolated incident" of opening protected legal mail, "without any evidence of improper motive or resulting interference with [plaintiff's] right to counsel or access to the courts, does not give rise to a constitutional violation." *See Smith v. Maschner,* 899 F.2d 940, 944 (10th Cir.1990). A United States District Court in the District of Massachusetts, having canvassed First Circuit law in the area, agreed that occasional violations of prison regulations governing the reading of prisoners' legal mail did not violate the Sixth Amendment. *See Thomas v. Rufo,* Civ. A. No. 92–10261–Z, 1994 WL 175047, at *2 (D.Mass. Apr.20, 1994) (concluding nonetheless that 35 instances of improper handling of legal mail demonstrates that a reasonable fact-finder could find deliberate indifference, and, therefore, declining to rule that defendants were entitled to qualified immunity).

Some courts have required the prisoner to show that that such searches denied him his right of access to a court. *See Oliver v. Fauver,* 118 F.3d 175, 178 (3d Cir.1997) (holding that prisoner must demonstrate that interference with his legal mail actually injured him in order to succeed on a right-to-court-access claim); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 613–14 (W.D.N.Y.1992) (granting summary judgment to defendants since plaintiff-prisoner failed to show actual injury resulted from search and temporary seizure for a "week or so" of a complaint he had drafted). Others have found that the potential chilling effect on attorney-client communications, as opposed to actual injury, is enough to assert a constitutional violation when prison officials

Barstow also claims that Defendants violated his rights under the Due Process Clause of the Fourteenth Amendment. The justice of the peace's review of Turcotte's warrant application and issuance of a search warrant, however, satisfies any due process concerns stemming from this search. Even if the warrant was invalid, the Supreme Court in *Hudson v. Palmer*, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), held that "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation [sic] remedy for the loss is available." *Id.* at 533, 104 S.Ct. 3194. This Court is not clear what remedy is in order for Turcotte's removal of some of Barstow's papers from his prison cell, since Barstow admits that the materials were sent back to his attorney after Turcotte determined that they did not contain any evidence of terrorizing. (See P.'s Objection to Def.'s Mot. for Summ. J. at 4–5). In any event, Barstow fails to allege that Maine does not provide an adequate post-deprivation remedy for his temporary loss of his papers, and, therefore, the Court does not need to consider this matter further. *See Romero–Barcelo v. Hernandez–Agosto*, 75 F.3d 23, 33 (1st Cir.1996) (declining to address whether an adequate post-deprivation remedy is available under state law where plaintiff fails to allege or argue that such a remedy is lacking) (citation omitted).[9]

In fact, Turcotte has filed four claims under state law. Since the Court grants summary judgment with regard Counts I and II, the Court no longer has federal question jurisdiction over this matter pursuant to *28 U.S.C. § 1331*. Furthermore, the Court declines to exercise supplemental jurisdiction over the remaining Counts pursuant to *28 U.S.C. § 1367(c)*. Barstow is free to seek whatever relief may available in Counts III, IV, V, and VI in state court.

read legal mail. *See Marquez*, 1998 WL 57000, at *2.

All of this contradictory case law points out that, regardless of whether a constitutional violation occurred when Turcotte temporarily seized and read Barstow's letter to his attorney, all Defendants are entitled to qualified immunity. *See Schenck v. Edwards*, 921 F.Supp. 679, 690 (E.D.Wash.1996) ("The court is not aware of any clearly established law in [the Ninth] [C]ircuit which requires the inmate's presence during an inspection of the legal documents in his cell."); *Proudfoot v. Williams*, 803 F.Supp. 1048, 1053 (E.D.Pa. 1992) ("The question of reading a prisoner's outgoing legal mail remains unsettled—neither the Supreme Court nor the Third Circuit has addressed the matter squarely"); *cf. Allen v. Rainey*, Civ. No. 93–1580–FR, 1994 WL 487936, at *3 (D.Or. Sept.7, 1994) ("It is arguable, in light of *Wolff*, that a reasonable prison official could not believe that clearly marked legal mail, which could not be read by officials when it arrived at the prison, could be read during a random search of a prison cell.").

9. The Court is aware that there is some authority that a claim of denial of access to the courts vitiates the *Hudson* analysis, which is thought to be limited to the procedural due process context. *See Zilich v. Lucht*, 981 F.2d 694, 696 (3d Cir.1992) ("*Hudson* ... concerned only the deprivation of property by prison officials and, by its own terms, is limited to the procedural due process context. Where, as in the case at hand, a prisoner's complaint alleges the taking of legal property that results in the denial of his access to the courts, the *Parratt/Hudson* analysis cannot, and does not, apply."). Under the Third Circuit's rationale, the availability of an adequate post-deprivation remedy is irrelevant when substantive violations of constitutional rights take place. However, Barstow has not here put forward an adequate denial-of-access claim. (See P.'s Objection to Def.'s Mot. for Summ. J. at 11) (making unsupported assertions stating that Turcotte gave "the Prosecution specific aspect [sic] of Plaintiff [sic] Criminal case that is Subject of this Civil Act [sic]" and that "[t]he prosecution had knowledge of Plaintiff [sic] criminal Defense that violates Plaintiff [sic].")

**CONCLUSION**

The Court **GRANTS** summary judgment as to all Defendants on Counts I and II.

So **ORDERED**